NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230288-U

NO. 4-23-0288

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 22, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Z.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|       Petitioner-Appellee, | ) | No. 21JA41 |
|       v. | ) | |
| Deanna D., | ) | Honorable |
| | ) | John C. Wooleyhan, |
|       Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Respondent forfeited any contention that the trial court erroneously admitted the service plans and caseworker testimony, and the evidence presented was sufficient to satisfy the State's burden to show that respondent was unfit.

¶ 2    Z.D., born in 2011, is the daughter of respondent Deanna D. and James D. In March 2023, the trial court found both respondent and James D. unfit and that termination of their parental rights would be in Z.D.'s best interest. Respondent appeals, arguing that the court improperly considered hearsay evidence when it ruled she was unfit. James D. is not a party to this appeal. We find that respondent has forfeited any issue with respect to the admission of the service plans, as she did not join in the objection to their admission, and the caseworkers' testimony, as she did not object to it. Furthermore, the evidence presented satisfied the State's burden to show respondent was unfit. Accordingly, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4            In June 2021, the State filed a petition for adjudication of wardship, alleging that

Z.D. was abused or neglected pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act)

based on, *inter alia*, (1) respondent's violation of an existing care plan that required Z.D. to live

with someone other than respondent, (2) respondent's use of intravenous drugs in Z.D.'s presence,

and (3) an incident that resulted in respondent's arrest for the domestic battery of Z.D. See 705

ILCS 405/2-3(1)(b) (West 2020).

¶ 5            The trial court conducted a shelter care hearing and found probable cause to

conclude that Z.D.'s environment was injurious to her welfare; it granted temporary custody and

guardianship to the Illinois Department of Children and Family Services (DCFS). The court

ordered respondent to stay at least 1000 feet from Z.D.'s foster home, and it barred respondent

from visiting Z.D. or having direct or indirect contact with the "foster placement."

¶ 6            In January 2022, the trial court conducted an adjudicatory hearing. The State

withdrew the allegations relating to domestic battery, and respondent admitted the remaining

allegations. The court found that Z.D. was an abused and neglected minor and scheduled a

dispositional hearing for March 2022. At the dispositional hearing, the court entered a written order

finding that it was in the best interest of Z.D. to be made a ward of the court. It further found that

both parents were unable for a reason other than financial circumstances alone to care for, protect,

train, or discipline the minor. The court placed guardianship and custody with DCFS and advised

respondent she was required to cooperate with DCFS and "comply with the terms of the after care

plan or risk loss of custody and possible termination of [her] parental rights."

¶ 7                             A. The Termination Petition

¶ 8            In December 2022, the State filed a petition to terminate respondent's parental

rights. The State alleged respondent was unfit because she (1) failed to make reasonable efforts to correct the conditions that were the bases for the removal of Z.D. during either of the nine-month periods of January 2022 through October 2022 or October 2022 through July 2023; (2) failed to make reasonable progress toward the return of Z.D. within either of the relevant nine-month periods; and (3) failed to maintain a reasonable degree of interest, concern, or responsibility as to Z.D.'s welfare. See 750 ILCS 50/1(D)(b), (D)(m)(i), (ii) (West 2022).

¶ 9                                B. The Fitness Proceedings

¶ 10          In March 2023, the trial court conducted the fitness portion of the termination hearing.

¶ 11                                1. *The State's Evidence*

¶ 12          At the State's request, the trial court took judicial notice of the neglect petitions; the temporary custody order; the order adjudicating the minor neglected, as well as the associated dispositional order; and the permanency review orders of February 2022, June 2022, September 2022, and November 2022. The State called Sarah Goodapple and Mary Miller as witnesses. Goodapple had been a child welfare specialist at Chaddock Foster and Adoption (Chaddock) and was the caseworker for Z.D.'s case from October 2021 to October 2022. She was not the first caseworker for the family. Miller became the caseworker on October 4, 2022, and was the caseworker as of the hearing date.

¶ 13                                a. Sarah Goodapple

¶ 14                        i. *The Service Plan of December 1, 2021*

¶ 15          The State asked Goodapple to explain her role in the preparation of the service plan for Z.D. initiated on December 1, 2021. She explained that one of her functions as a caseworker was to develop service plans, which she described as "document[s] *** created with the

recommended services in order for the family to have the children return home." Service plans are based on "recommendations from the integrated assessment as well as case opening details." Integrated assessments are conducted by third parties and include medical and social histories.

¶ 16    Goodapple created the service plan dated December 1, 2021. She agreed that such plans were "generally created in the regular course of business with Chaddock." Goodapple did not offer any testimony about Chaddock's practices for entering data and observations into the plan.

¶ 17    The December 2021 plan addressed respondent's progress in meeting the plan goals from June 2021 through the start of December 2021. For respondent, these were: (1) cooperating with the caseworker; (2) obtaining a mental health assessment and participating in all recommended mental health services; (3) obtaining a substance abuse assessment, participating in all recommended substance abuse services, remaining drug-free and sober, "not allowing any people that have substance abuse to come into her home," and participating in drug screening; (4) taking a parenting class (visitation would usually be expected, but respondent was barred from seeing Z.D.); (5) maintaining housing and employment; and (6) completing a domestic violence assessment—which respondent seemingly had done but failed to document—and participating in recommended services.

¶ 18    Goodapple testified respondent received an unsatisfactory rating in each category. Respondent did not "engage" with the caseworker until October 26, 2021, thereby failing to cooperate. Respondent also failed to complete a substance abuse evaluation or a mental health evaluation, and she did not participate in parenting classes. Further, respondent's home was unsafe and unclean; respondent claimed to be employed but did not provide documentation. Although respondent completed a domestic violence assessment on November 23, 2021, she did not sign a

consent for Chaddock to receive the results. In sum, respondent did not engage in any services during the six-month period.

¶ 19                              ii. *The Service Plan of May 26, 2022*

¶ 20          Goodapple offered similar testimony about the May 26, 2022, service plan. The plan was "created in the regular course of business with Chaddock" and covered December 2021 through May 2022. The "tasks" for respondent were the same as those in the previous plan. Respondent was again rated unsatisfactory in all categories. Goodapple explained that respondent "really struggled with appropriate communication with the caseworker" and "would often not attend scheduled visits and was difficult to reach." Although respondent "briefly engage[d] in mental health services *** from February to April [2022]," the service provider stated respondent had "cancelled all of her subsequent appointments after her incarceration." Respondent engaged in substance abuse services from February through April 2022, but she canceled her post-incarceration appointments. Respondent was discharged from parenting classes because of a lack of sobriety, reported she was homeless for part of the plan period, and had no permanent housing after her incarceration. She was also deemed ineligible for domestic violence services because "she would need to have her mental health and substance abuse managed before she could begin [the recommended] program."

¶ 21          On cross-examination by Z.D.'s attorney, Goodapple stated that respondent had been told to report for random drug testing but never reported when told to do so. Further, respondent had not given any cards or gifts to Goodapple for Z.D., and Goodapple was not aware of any support that respondent had offered to the child.

¶ 22          There were no objections based on hearsay to any of Goodapple's testimony.

¶ 23                              b. Mary Miller

¶ 24        Miller testified she had been a child welfare specialist with Chaddock since July 25, 2022; this case was transferred to her on October 4, 2022. After the trial court's November 2022 change of goal for Z.D. from "return home," Miller created the service plan, which covered May 26, 2022, to December 2022. That plan was created in the regular course of Chaddock's business. Miller summarized the reasons for respondent's rating of unsatisfactory during this plan period; respondent had not completed any services.

¶ 25        On cross-examination by Z.D.'s attorney, Miller stated that respondent had given her a Valentine card to give to Z.D., but this was respondent's sole communication with the child.

¶ 26        As with Goodapple's testimony, no party raised any hearsay objection to Miller's testimony.

¶ 27                            c. Admission of the Service Plans

¶ 28        Respondent did not present any evidence. After the parties offered argument, the State asked the trial court to admit the service plans as evidence. Counsel for James D. objected, asserting that the State had not offered an adequate business records foundation; respondent's counsel did not join in the objection. The court ruled the plans were admissible as business records. The court commented, "Based on all the evidence, the Court cannot rely solely on any one particular evaluation that would be given to a certain part of a service plan but instead look at all the evidence in the case."

¶ 29                            2. *The Trial Court's Findings*

¶ 30        The trial court found both parents unfit. Concerning respondent, the court stated:

        "The Court could also find that each of [the State's three] allegations has been

        proven by clear and convincing evidence in the relevant time periods alleged by the

        People. [Respondent] did have some contact with the caseworkers and some contact

with some of the service providers but never completed any services under the service plan, never made the type of progress that is contemplated by the statute which could be a basis for the return of the minor to [her]. Whatever efforts [she] did make did not translate to any progress as contemplated by the statute. Also failed to maintain a reasonable degree of interest, concern or responsibility as to the minor's welfare."

¶ 31                C. The Best-Interest Proceedings

¶ 32        After making the unfitness findings, the trial court immediately proceeded to the best-interest hearing.

¶ 33                1. *Mary Miller*

¶ 34        Miller testified that Z.D. was in her third placement, which Miller classified as a fictive kin placement. Miller had observed Z.D. in the home. She noted Z.D.'s bond to her foster parents' children and a very close bond between Z.D. and her foster mother. Z.D. expressed happiness about joining her foster siblings in activities and liked to spend time with her foster mother. Her grades had improved while she was in this placement, and both foster parents were encouraging her to work hard in school. Z.D. said that she wanted to be adopted, and the foster parents had signed a permanency agreement.

¶ 35                2. *The Trial Court's Findings*

¶ 36        The trial court concluded the manifest weight of the evidence supported the finding it was in the best interest of Z.D. that the parental rights of respondent be terminated. The court found that Z.D. was in a loving home and that all her needs were being met. Moreover, nothing in the evidence showed when, if ever, Z.D. could be returned to either of her parents.

¶ 37        This appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39        On appeal, respondent categorizes her argument as one challenging the sufficiency of the evidence that she was an unfit parent. She argues that, in finding that the State proved she failed to maintain a reasonable degree of interest, concern, or responsibility as to Z.D.'s welfare, the trial court gave insufficient weight to evidence of the difficult circumstances she faced. She also contends that most of the evidence on which the court relied to find she was an unfit parent was improper hearsay and, therefore, inherently unreliable. In particular, she maintains that the State failed to supply the foundation required to admit the service plans as business records under section 2-18(4)(a) of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2022)) and that the caseworkers' testimony largely consisted of hearsay summaries of the plans.

¶ 40        The State argues four points in response. First, it contends that respondent's argument fails to explain how the evidence negated each of the grounds advanced below. Second, it argues that the evidence in its entirety—that is, the evidence including the evidence respondent challenges—affirmatively shows that the State proved all three allegations. Third, it argues that the trial court's ruling that the plans were admissible negates respondent's arguments. Finally, the State argues that respondent's argument is misdirected because, instead of offering evidence that respondent was fit, she instead focuses on the hearsay argument and the admissibility of the service plans despite the court's explicit finding that they were business records.

¶ 41                       A. The Standard for Finding Parental Unfitness

¶ 42        Proceedings to terminate parental rights have two phases: the fitness portion and the best-interest portion; the State has the burden of proof in both. *In re Al. P.*, 2017 IL App (4th) 170435, ¶ 40. In the fitness portion at issue here, the State must prove by clear and convincing evidence that the respondent is unfit under one or more of the grounds set out in section 1(D) of

the Adoption Act (750 ILCS 50/1(D) (West 2022). 705 ILCS 405/2-29(2), (4) (West 2022).

¶ 43　　　　Because "the trial court's opportunity to view and evaluate the parties *** is superior," a determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. The Illinois Rules of Evidence apply at the fitness hearing. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 75.

¶ 44　　　　A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 28.

¶ 45　　　　　　　　　B. The Nature of Respondent's Argument

¶ 46　　　　Before engaging in an analysis of the issues presented, it is important to understand whether respondent is challenging the admissibility of the State's evidence or its sufficiency. If the evidence of unfitness is insufficient, it would be appropriate to reverse the judgment outright. See, *e.g.*, *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 113 (stating a finding of neglect would be reversed outright if the evidence were insufficient). However, when we address the question of the sufficiency of the evidence below, we consider *all* the evidence, not just that which was properly admitted. *Id.* ¶ 114. By contrast, if we determine that a trial court based a finding on improperly admitted evidence, the result would not be an outright reversal, but potentially a remand for a new hearing. *Id.* ¶¶ 108, 114, 119.

¶ 47　　　　If viewed as a sufficiency-of-the-evidence argument, respondent's contentions are meritless. As noted above, when addressing sufficiency of the evidence, we are to consider *all* the evidence before the trial court. *Id.* ¶ 114. As to the evidence now characterized as hearsay, "the

law is clear that hearsay admitted without objection can be given its natural probative weight." *M.D.*, 2022 IL App (4th) 210288, ¶ 102. Respondent's argument—which appears to be that all inadmissible and improperly admitted hearsay is equally unreliable—is not supportable in law.

¶ 48    Beyond the sufficiency of the evidence, however, respondent also focuses on the admissibility of the service plans and the caseworkers' testimony about them. As discussed above, examination of the admissibility of some of the evidence is a distinctly different inquiry than examining the weight of all the evidence. Respondent's prayer for relief, which requests a remand of the matter, is actually consistent with the former, *i.e.*, examination of the admissibility of particular evidence. We now examine these evidentiary issues within the context of the issue of unfitness.

¶ 49                    C. Admissible and Inadmissible Hearsay

¶ 50    Respondent asserts that because the State did not establish an adequate foundation for the admission of the service plans on which the State relied at the fitness hearing under section 2-18(4)(a) of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2022)), those plans were inadmissible hearsay. She further argues that the caseworkers' testimony concerning the plans' contents was inadmissible hearsay.

¶ 51    Illinois Rule of Evidence 801(c) (eff. Oct. 15, 2015) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Service plans and DCFS investigative records are admissible under section 2-18(4)(a) of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2022)), which is a variation of the business record exception to the hearsay rule. *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 30. Except in delinquency proceedings when a minor's liberty is at stake, proceedings under the Juvenile Court Act employ the general rules of civil practice unless

the Juvenile Court Act specifically governs the procedure at issue. *In re A.B.*, 308 Ill. App. 3d 227, 234 (1999). The Juvenile Court Act specifically provides for the admission of business records into evidence so long as statutory foundational requirements are met. 705 ILCS 405/2-18(4)(a) (West 2022).

¶ 52    Section 2-18(4)(a) of the Juvenile Court Act is a variation of the common-law "business records" exception to the hearsay rule. *A.B.*, 308 Ill. App. 3d at 235. "Business records are considered reliable, and thus admissible, because of the regular, prompt, and systematic manner in which they are kept and the fact that they are relied upon in the operation of the business." *Id.* "For a writing to be admissible as a business record under section 2-18(4)(a), the proponent must establish a foundation showing that the writing was (1) made as a memorandum or record of the event, (2) made in the ordinary course of business, and (3) made at the time of the event or within a reasonable time thereafter." *Id.* "The author of the writing need not testify or be shown to be unavailable; anyone familiar with the business and its procedures may testify about how the writing was prepared." *Id.*

¶ 53    Here, the State elicited from each witness only the conclusory incantation that the record was "created in the regular course of business." The State did not offer any evidence about Chaddock's recordkeeping practices as they applied to service plans, such as when entries are normally made. It is unsurprising, then, that respondent seeks to challenge the sufficiency of this minimal effort to establish a foundation for the admission of the service plans. Generally, however, a contemporaneous objection to the foundation for evidence is a precondition for an appellate court's review of the admission of that evidence. See *In re M.W.*, 232 Ill. 2d 408, 430 (2009) (noting that to preserve an objection to the admission of evidence, a party in a proceeding under the Juvenile Court Act must object at the hearing; no postadjudication motion is required).

Furthermore, a party who fails to join in another party's objection forfeits the issue for appellate review. See *Auten v. Franklin*, 404 Ill. App. 3d 1130, 1153 (2010) (finding the parties who failed to join in the codefendant's objection to argument forfeited the issue on appeal). Respondent neither objected to introduction of the service plans nor joined in the father's objection; this normally results in forfeiture of the issue on appeal. This is also true with respect to any issue relating to the admissibility of the testimony of the two caseworkers, as neither parent objected to it.

¶ 54        Here, however, the State has failed to argue that respondent forfeited the hearsay issues she raises on appeal. The State's failure to raise respondent's procedural forfeiture of the issue of the admissibility of the plans and the caseworkers' testimony would ordinarily result in the State forfeiting the forfeiture argument on review. See, *e.g.*, *People v. Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46 ("The rules of waiver also apply to the State, and where *** the State fails to argue that defendant has forfeited the issue, it has waived the forfeiture."). In fact, the State fails entirely to respond to the argument about the admissibility of the plans and the caseworkers' testimony. In fairness, this is likely because the State construed respondent's argument as one challenging the sufficiency of the evidence, not its admissibility.

¶ 55        Under the circumstances presented, we do not impose forfeiture on the State. See, *e.g.*, *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33 ("[C]ourts of review may sometimes override considerations of waiver or forfeiture in the interests of achieving a just result and maintaining a sound and uniform body of precedent."); Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994). The State is not responsible for respondent's confusing labeling and articulation of her arguments, which the State apparently construed as sufficiency-of-the-evidence issues. Furthermore, it seems beyond question that any defects in the foundation for admission of the

plans could have been easily cured by appropriate questioning of the caseworkers, who were not just organizational bookkeepers but the authors of the documents in question. Consequently, regardless of whether the State has argued forfeiture here, we find that respondent has forfeited the issues concerning admissibility of the plans and the caseworkers' testimony. *M.W.*, 232 Ill. 2d at 430.

¶ 56        Finally, as is discussed below, the admissibility of the plans is not critical to the outcome here. Even if respondent were correct that the foundation for the service plans is lacking, affirmance is required even if we consider only the other evidence in the case.

¶ 57        D. The Evidence Showed a Failure to Make Reasonable Progress

¶ 58        Respondent argues that the evidence was insufficient to prove that she failed to maintain a reasonable degree of interest, concern, or responsibility as to Z.D.'s welfare, but that argument cannot stand alone. It is well settled that because "each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11. We need only to examine the trial court's finding on respondent's failure to make reasonable progress toward Z.D.'s return (see 750 ILCS 50/1(D) (West 2022); 705 ILCS 405/2-29(2), (4) (West 2022)) to determine its decision was not against the manifest weight of the evidence. Furthermore, we can reach this conclusion without considering the service plans respondent argues were improperly admitted. In substance, this is the same review we would apply if we had found the plans were improperly admitted. See *In re M.H.*, 2020 IL App (3d) 190731, ¶ 21 (finding where evidence is improperly admitted, remand for a new fitness hearing is not required if the other evidence was sufficient to establish at least one ground of parental unfitness).

¶ 59      Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2022). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and [the] court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)).

¶ 60      Likewise, this court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

See *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 61      Both Goodapple and Miller testified that respondent failed to complete any services. Given the weight reviewing courts place on compliance with the service plans, a complete failure to complete required services is not consistent with reasonable progress. The implication

of respondent's argument is that the caseworkers' testimony relating to her plan compliance, as inadmissible hearsay, was unreliable. This is unpersuasive. The caseworkers' testimony could not be more straightforward; respondent completed *no* services. The caseworkers testified to having prepared the plans, so they were both familiar with respondent's case. Each was, for a specific period of time, the main caseworker following the case. Giving their testimony its natural probative weight (*M.D.*, 2022 IL App (4th) 210288, ¶ 102), the testimony was sufficient to sustain the State's burden of proof to show that respondent failed to make reasonable progress toward Z.D.'s return in the specified periods. The State therefore met its burden to show respondent was unfit.

¶ 62                               III. CONCLUSION

¶ 63          For the reasons stated, we affirm the trial court's judgment.

¶ 64          Affirmed.